UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

STERLING SAVINGS BANK, a Washington
chartered commercial bank,

                Plaintiff,

     v.

SING CHAN and DEBBIE CHAN,

                Defendants and Third-Party
                Plaintiffs,

     v.

STARK GROUP LLC, an Oregon Limited
Liability Company; PROGRESS
CONSTRUCTION LLC, an Oregon Limited
Liability Company, MARK MADDEN, and
RICHARD GRIMES,

                Third-Party Defendants.

3:12-cv-00269-ST

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

STEWART, Magistrate Judge:

## **INTRODUCTION**

      Plaintiff, Sterling Savings Bank ("Sterling"), filed the underlying action against

defendants, Sing Chan and Debbie Chan ("Chans"), to foreclose on commercial property the

Chans had purchased from the Stark Group LLC.  The Chans filed a Third-Party Complaint

1 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

against third-party defendants, the Stark Group LLC, Progress Construction LLC ("Progress"), Mark Madden ("Madden"),[1] Richard Grimes ("Grimes"), and others,[2] alleging claims for fraud and breach of fiduciary duty (docket #7).  Based on the parties' stipulation, Judge Hernandez dismissed all claims, defenses, counterclaims, and third-party claims among Sterling, the Chans, and Shawn Marvin on October 12, 2012 (docket #47).  The Chans then filed an Amended Third-Party Complaint against the Stark Group, Progress, and Grimes (docket #51), alleging claims for fraud, constructive trust, and breach of contract and covenant of good faith and fair dealing.

On September 16, 2013, with permission of the court, the Stark Group filed an Amended Answer asserting a new counterclaim against the Chans for specific performance of an alleged settlement agreement (docket #108), as well as a motion to enforce that alleged settlement agreement (docket #109).  Because the alleged settlement agreement would result in a dismissal of all claims by all parties, Progress and Grimes do not oppose the motion.

All parties consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c) (docket #115).  On October 16, 2013, the court held an evidentiary hearing, received the testimony of the Stark Group's expert witness, William Holmes, and heard oral argument on the Stark Group's motion (docket #123).  Based on the following Findings of Fact and Conclusions of Laws, the Stark Group's motion is denied.

///

///

///

---

[1] Madden is the authorized agent of Stark Group LLC.  The Stark Group LLC and Madden are referred to collectively as the Stark Group.
[2] A Stipulated Judgment of Dismissal entered on January 4, 2013, disposed of the third-party claims against these other third-party defendants (docket #66).

2 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

# FINDINGS OF FACT

## I.      Parties

The Chans, citizens of Oregon, purchased commercial real estate from the Stark Group in

2008.

The Stark Group, an Oregon limited liability company which is engaged in the business

of developing real estate, sold the disputed property to the Chans.  Madden, an Oregon resident,

represented the Stark Group in the transaction with the Chans.

Progress, a residential contractor licensed in Oregon, performed renovations on the

disputed property prior to the Chans' purchase.  Grimes, a resident of Oregon, is an employee of

Madden and also the managing member of Progress.

## II.     Initial Settlement Negotiations

The Chans and the Stark Group engaged in two formal mediation sessions in early July

2013.  When mediation failed, the parties continued to negotiate through their respective counsel

with Richard J. Whittemore and Thomas L. Hutchinson representing the Stark Group and

Gregory P. Dolinajec representing the Chans.  On July 25, 2013, the Stark Group proposed that

in exchange for a release of all claims, it would pay $1.05 million to the Chans over 18 months

"in the form of a note secured by real estate with appropriate equity for the balance, subject of

course to approval and appraisal by" the Chans.  Hutchinson Decl., Ex. 2.[3]  The Chans made a

counteroffer of $1.15 million paid over 18 months "to be secured by real property acceptable to

the Chans," a signed Confession of Judgment, and a "structure that relieves the tax burden to the

Chans."  *Id*, Ex. 3.  Mr. Dolinajec noted that the proposed security "is an important issue" and

that relief of the tax burden "is essential."  *Id.*

---

[3] The parties have submitted documents with various attachments.  Citations to declarations are identified by the last name of the declarant and citations are to the attached exhibits.

3 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Between July 26 and July 29, 2013, counsel exchanged emails regarding these two proposals. As of July 29, the Stark Group refused to pay more than $1.05 million. *Id*, Ex. 4. Insisting on $1.15 million, Mr. Dolinajec advised that his clients' "willingness to be more flexible concerning a settlement amount is directly related to tax issues." *Id*, p. 1. The Stark Group rejected both a Confession of Judgment and real property as security for its payment, explaining that either form of security was acceptable, but not both. *Id*, p. 2. Mr. Dolinajec responded that if the Stark Group provided "excellent quality security," a Confession of Judgment would not be necessary. *Id*. Mr. Whittemore also represented that "Mr. Madden will cooperate to the extent possible to structure a deal that is to Mr. Chan's tax advantage." *Id*. Mr. Dolinajec responded: "If we reach a settlement [,] we will have to get to this [tax] issue asap. If we are unable to solve it we will be back to square one." *Id*, p 3.

### III.   **August 1 and 2 Negotiations**

After Mr. Whittemore reiterated the Stark Group's position by telephone on July 29 and in an email two days later, Mr. Dolinajec responded by email on August 1 as follows:

> The Chans are willing [to] *accept the offer provided the tax issue is resolvable and there is adequate security*. I understand that you don't feel the tax issue to be a core issues [*sic*]. I do. If not approached correctly the tax would be approximately $240,000. . . . This demands attention before the fact, it is not merely a house keeping matter once the terms are agreed to.

*Id*, Ex. 5, p. 1 ("August 1 Terms") (emphasis added).

The next day the Chans outlined "a proposed structure" for relieving them of the anticipated tax burden by Madden and the Chans forming a limited liability company. *Id*, Ex. 6 ("August 2 Term Sheet"). He warned that if the settlement required the Chans to pay the tax burden, then "a settlement of the amount of $1,050,000 is not acceptable." *Id*, p. 2.

4 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Later that day the parties appeared before Magistrate Judge Hubel for a scheduled status
conference.  Mr. Whittemore represented to the court that the parties had:

> agreed to some of the key terms of the settlement . . . and we've not
> worked out all the details, but we do feel that we are close enough to be
> able to report to you that we—we've been operating under a handshake
> agreement for the past two or three weeks.  (Inaudible) discovery while we
> work on this and (inaudible) work very hard to get to this point that we
> can report to you that we are going to spend the next several days of
> (inaudible) that (inaudible) final agreement.

*Id*, Ex. 23, pp. 2-3.

When asked to respond, Mr. Dolinajec told the court that Mr. Whittemore had
"accurately characterized the status."  *Id*, p. 3.

### III. <u>Subsequent Negotiations</u>

Counsel for the Stark Group initially expressed concern about Mr. Dolinajec's plan in the
August 2 Term Sheet to mitigate the tax burden and suggested that the Chans vet the proposal
with tax advisors.  *Id*, Ex. 7, p. 1.  Mr. Hutchinson forwarded names of tax specialists for
Mr. Dolinajec to contact, but made no independent investigation of the issue.  *Id*, Exs. 8 and 11.
After two of the tax references were unavailable, Mr. Dolinajec sent the August 2 Term Sheet to
a third specialist, who indicated that "he felt the LLC solution as too closely related to the
lawsuit." *Id*, Ex. 13.

Mr. Dolinajec reported to Mr. Hutchinson that his attempt to solve the Chans' tax burden
with the structure proposed in the August 2 Term Sheet had been unsuccessful.  *Id*.  He
suggested the parties resume discovery or reconsider his earlier offer of $1.5 million, unless
opposing counsel had a different proposal for eliminating the tax burden.  *Id*.  Mr. Whittemore
responded that the parties "had a settlement with details to be worked out. . . .  We feel there is a
deal and we have complied and remain ready to fulfill the terms of the deal." *Id*.  The same

morning, Mr. Dolinajec responded that the parties "do not have a settlement" and that the Chans

rejected the $1.05 million offer, insisting the amount "has always been contingent on adequate

security. Not just any security but security that had sufficient equity in our assessment to cover

the settlement payments." *Id*, Ex. 14, p. 1. He also suggested the Stark Group "accommodate

the Chans['] desire to defer the tax or to increase the offer" if they wished to "resume settlement

discussions." *Id*. Mr. Dolinajec then refused to continue settlement talks "unless [opposing

counsel] abandon this fiction" that a deal had been reached and "that the tax issue was just

tweaking the terms." *Id*, Ex. 15.

Mr. Hutchinson guided the communication back towards a discussion of adequate

security and tax options by responding: "I thought you asked us not to refer to there being a deal,

so I didn't." Dolinajec Decl., Ex. A. Around August 22, counsel for the Stark Group suggested

three properties as security: 1604 SE Caesar Chavez Blvd., 8074 SE 6th Avenue, and 2929 NE

Martin Luther King Blvd. ("Martin Apartments"). Hutchinson Decl., Ex. 17, pp. 3-5.

Mr. Dolinajec rejected the first two properties as inadequate security because he evaluated

adequacy under the assumption of no more than a 90% encumbrance-to-value ratio. *Id*, p. 3.

Instead, he suggested the Freedom Center or the Overton office building as security. *Id*.

On August 24, Mr. Dolinajec again suggested that the Stark Group consider increasing its

offer to cover the taxes and costs "to bring this to an end," clarifying that he wanted to avoid any

presumption that the case would settle without a tax solution. *Id*, p. 1. In response, Madden

authorized his counsel to increase the settlement payment to cover up to half ($120,000) of any

actual tax liability the Chans incurred as shown in a "Binding Settlement Term Sheet," which

also included the Martin Apartments as security for the $1.05 million payment over 18 months.

*Id*, Ex. 18. In reply, Mr. Dolinajec changed the "Binding Settlement Term Sheet" to include the

Stark Group paying $1.5 million over 24 months, allowing the conveyance of the property at

1604 SE Caesar Chavez Blvd. to serve as a substitute for the final $450,000 payment, and

providing security in the form of the Martin Apartments, a Confession of Judgment, and

additional property with a unencumbered equity value of $1.6 million.  *Id*, Ex. 19.

On August 28, counsel for the Stark Group stated that Mr. Madden agreed to provide a

Confession of Judgment in the amount of $1.05 million and two properties as additional security

(the Martin Apartments and the King Apartments), and to pay up to the Chans' full tax liability

of $240,000 subject to proof of that liability.  *Id*, Ex. 20.  He reiterated, however, that he still

believed the parties had a binding settlement agreement as of August 1.  *Id.*  Mr. Dolinajec's

final communication withdrew all prior settlement offers.  *Id*, Ex. 22.

## CONCLUSIONS OF LAW

This court has diversity jurisdiction over the Complaint filed by Sterling pursuant to

28 USC § 1332 because Sterling is a Washington state-chartered bank, all defendants are citizens

of the State of Oregon, and the value of the matter in controversy exceeds $75,000, exclusive of

interest and costs.  The court has supplemental jurisdiction over the Chans' third-party claims

against the Stark Group pursuant to 28 USC § 1367(a) because they form part of the same case

or controversy as the original Complaint.

The Stark Group moves for specific performance of a settlement agreement allegedly

created by its offer in emails between July 26 and July 29 (*id*, Ex. 4), which the Chans allegedly

accepted on August 1 (*id*, Ex. 5), again in the August 2 Term Sheet (*id*, Ex. 6), and again at the

August 2 court hearing.[4]  *Id*, Ex. 23.  According to that alleged settlement as set forth in the

---

[4] The Stark Group also argues that the Chans accepted the offer in their Opposition to the Motion to Amend (docket #99) by stating: "The agreement at the time of the status conference was that Plaintiffs would accept the sum of $1.05 million in settlement, if the parties could resolve the tax issue and agree on appropriate security (since Defendants wanted to pay the sum in installments)."

August 1 Terms, the Stark Group agreed to pay the Chans $1.05 million over 18 months in exchange for a release of all claims and to continue negotiations to resolve the details of deferring the Chans' tax liability and providing adequate security for the installment payments. The Chans argue that no settlement agreement was formed because two essential terms, namely the tax and security issues, were never resolved.  In contrast, the Stark Group argues that the settlement agreement encompassed all essential terms by characterizing the tax and security terms simply as details for implementing the payment obligation.

## I.    Legal Effect of the August 1 Terms

### A.    Legal Standard

A district court has the "equitable power to enforce summarily an agreement to settle a case pending before it," but only if the settlement is complete.  *Callie v. Near*, 829 F2d 888, 890 (9th Cir 1987).  Summary enforcement is appropriate unless there is a dispute over the existence or the terms of an agreement to settle.  *Adams v. Johns-Manville Corp.*, 876 F2d 702, 708 (9th Cir 1989).  A settlement agreement is governed by state contract law and not federal common law. *Botefur v. City of Eagle Point*, 7 F3d 152, 156 (9th Cir 1993).

"Oregon subscribes to the objective theory of contracts."  *Newton/Boldt v. Newton*, 192 Or App 386, 392, 86 P3d 49, 52 (2004).  Under this theory, contract formation does not depend on the parties' "uncommunicated subjective understanding," but rather their "objective manifestations of intent, as evidenced by their communication and acts."  *See id*; *Dalton v. Robert Jahn Corp.*, 209 Or App 120, 132, 146 P3d 399, 406 (2006).  The Stark Group, as the proponent of the alleged contract, has the burden of establishing its existence and its terms. *Holdner v. Holdner*, 176 Or App 111, 120, 29 P3d 1199, 1203 (2001).  At least as to a contract's essential terms, a valid contract exists only when there is a meeting of the minds and either the

parties agree to all terms or to a method to settle open and disputed terms, such that nothing is left for future negotiation. *Phillips v. Johnson,* 266 Or 544, 555, 514 P2d 1337, 1343 (1973).

Objective manifestations dictate when parties intend settlement agreements to become binding. *See Dalton*, 209 Or App at 136-37, 146 P3d at 408-09; *Hughes v. Misar*, 189 Or App 258, 265-66, 76 P3d 111, 116 (2003); *Kaiser Found. Health Plan of the Nw. v. Doe*, 136 Or App 566, 571, 903 P2d 375, 378 (1995), *modified on reconsideration*, 138 Or App 428, 908 P2d 850 (1996)  Agreed terms are binding immediately "[i]n the absence of some communicated condition regarding the postponement of the binding effect of their mutual assent, such as a provision in the terms sheet or a statement by one of the parties." *Hughes*, 189 Or App at 265-66, 76 P3d at 116.

**B.**    **Application**

On August 1, the Chans accepted the Stark Group's offer to pay $1.05 million over 18 months.  However, Mr. Dolinajec communicated that the Chans were "willing [to] accept the offer *provided the* tax issue is resolvable and there is adequate security. . . .  This demands attention before the fact, it is not merely a house keeping matter once the terms are agreed to." Hutchinson Decl., Ex. 5 (emphasis added).  This language clearly postponed the binding effect of the agreement regarding the payment amount until resolution of the tax and security issues.

Moreover, Mr. Dolinajec's statements throughout the negotiations confirm this intent. On August 2, in proposing formation of a limited liability company to resolve the tax burden, Mr. Dolinajec repeated his view that the settlement amount still depended on the parties' resolution of the tax and security terms:  "If the Chans are to pay the tax, a settlement of the amount of $1,050,000 is not acceptable." *Id*, Ex. 6.  On August 19, Mr. Dolinajec reiterated that the consideration paid "has always been contingent on adequate security.  Not just any security

but security that had sufficient equity in our assessment to cover the settlement payments."

*Id*, Ex. 14, p.1.

The Chans' expressed intent on August 1 not to settle without adequate security and resolution of the tax issue was consistent with Mr. Dolinajec's statements leading up to agreement. As early as July 26 in the Chans' first proposal, Mr. Dolinajec wrote: "The obligation is to be secured by real property acceptable to the Chans. This is an important issue. The sooner I know the proposed security the better. . . . A structure that relieves the tax burden to the Chans is essential." *Id*, Ex. 3. On July 29, in his edits to the proposed August 1 Terms, Mr. Dolinajec wrote that: "If we reach a settlement number we will have to get to this [tax] issue asap. If we are unable to solve it we will be back to square one." *Id*, Ex. 4, p.3. And in response to Mr. Whittemore's insistence that the Stark Group would not pay more than $1.05 million, Mr. Dolinajec responded that "[t]his is a problem" and "[t]he Chans [sic] willingness to be more flexible concerning a settlement amount is directly related to tax issues." *Id*, p. 1.

The Stark Group argues Mr. Dolinajec's representation at the status conference before Judge Hubel made the August 1 Terms binding. As support, it cites *Ingram v. City of Portland*, Civil No. 07-180-PK, (dock # 48, p. 3), 2007 WL 4209088 (D Or Oct. 22, 2007), adopted by *Ingram v. City of Portland*, Civil No. 07-180-PK, (dock # 52), 2007 WL 4209088 (D Or Nov. 26, 2007), for the rule that a settlement made in open court is binding. In *Ingram*, the terms of the agreement were put on the record following an off-the-record settlement conference. In contrast here, the parties only provided the court with the vague explanation that they had agreed to "some of the key terms." Hutchinson Decl., Ex. 23, p. 2. Because the transcript of the August 2 status conference in this case does not include the terms of any agreement, *Ingram* is distinguishable.

10 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Furthermore, the August 1 Terms are not binding simply because Mr. Dolinajec accepted Mr. Whittemore's characterization of recent negotiations as a "handshake agreement." That same morning, Mr. Dolinajec reminded opposing counsel that a settlement amount for $1.05 million would be unacceptable if the terms required his clients to absorb the tax burden. *Id*, Ex. 6. Mr. Dolinajec simply confirmed in court that the parties had made progress towards reaching a settlement, not that the parties had reached a final binding agreement on all terms.

In sum, as of August 1, the parties had reached an agreement only on the amount and timing of the settlement payment, namely $1.05 million paid over 18 months, with the other two terms of the settlement regarding the security and tax issues left to future negotiations. Accordingly, the representation made to the court on August 2 accurately describes the status of the settlement and the intentions of the parties at that time.

## II.    Specific Performance

The next issue is whether the Stark Group is entitled to an order requiring the Chans to specifically perform the two terms left open for future negotiation on August 1. As discussed below, those two terms were material terms. Only in extraordinary circumstances, not present here, will a court enforce an agreement that leaves such material terms up to future negotiation.

### A.    Legal Standard

To be entitled to specific performance, "a contract must be definite in all material respects, with nothing left for future negotiations." *Booras v. Uyeda*, 295 Or 181, 191, 666 P2d 791, 798 (1983); *see Genest v. John Glenn Corp.*, 298 Or 723, 744, 696 P2d 1058, 1071 (1985) (stating that *Booras* covers contracts when definiteness is disputed and specific performance sought). Although a court may allow exceptions for "subordinate details of performance," it

11 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

cannot, "under the guise of 'filling gaps' make the contract which it thinks the parties would have agreed to." *Booras*, 295 Or at 193, 666 P2d at 798.

"A term is 'material' to an enforceable agreement when it goes to the substance of the contract and, if breached, defeats the object of the parties in entering into the agreement." *Johnston v. Zimmer*, 191 Or App 26, 34, 81 P3d 92, 96 (2003) (citation omitted). "Other terms may be material to an agreement, depending on the nature of the agreement and the circumstances as they existed at the time the parties reached the agreement." *Dalton*, 209 Or App at 139-40, 146 P3d at 410. "A material term is definite when it is defined explicitly or . . . where a 'method is agreed upon by which such a term or provision can be settled.'" *Id* at 140, 146 P3d at 411, quoting *Phillips*, 266 Or at 555, 514 P2d at 1343.

### B.    Materiality

Throughout the negotiations, Mr. Dolinajec reiterated that resolving the tax and security issues were essential for his clients. The most striking examples occurred early in the negotiations when he stated that "[a] structure that relieves the tax burden to the Chans is essential" and "[security] is an important issue. The sooner I know the proposed security the better." Hutchinson Decl., Ex. 3. Later, in support of a higher settlement payment, he wrote that "[t]he Chans [sic] willingness to be more flexible concerning a settlement amount is directly related to tax issues." *Id*, Ex. 4, p.1. On August 19, Mr. Dolinajec reiterated that the consideration amount "has always been contingent on adequate security. Not just any security but security that had sufficient equity in our assessment to cover the settlement payments." *Id*, Ex. 14, p. 1. In fact, he wrote a separate email later that day to clarify that an "adequate tax structure is [a] material term of agreement." *Id*, Ex. 15, p. 1.

The context of the settlement reinforces the materiality of these terms. The Chans bought the property that is the subject of the underlying dispute in order to avoid tax consequences from an earlier real estate sale through a § 1031 exchange. The Stark Group knew about the Chans' motive in pursuing the sale when they began negotiating this settlement. Mr. Dolinajec again referenced the Chans' original motivation when he introduced the value of the tax liability on August 1: "The acquisition of the PDC 1 was to be a tax deferral exchange." *Id*, Ex. 5.

The origin of this lawsuit also illuminates the Chans' desire for security which they deemed to be adequate. The Chans sued the Stark Group alleging fraud and seeking a constructive trust, which indicates the distrust they brought to the settlement negotiations. As part of those claims, the Chans allege the Stark Group misrepresented the financial state of the property during the sale. These accusations would have made the Chans skeptical of any commercial property offered as security. In the context of the Chans' explicit statements about their priorities during the negotiations and their motivations for doing business with and then later suing the Stark Group, the security and tax terms were clearly material to the overall settlement.

C.    **Indefinite Terms**

An agreement to continue negotiating unresolved terms in good faith may be sufficiently definite to require specific performance. "[T]he fact that the parties have not expressly set forth all of the terms of their agreement does not . . . mean that the contract is unenforceable, so long as there is an objective method agreed upon by which the parties can settle the terms as a matter of fact." *Siegner v. Interstate Prod. Credit Ass'n of Spokane*, 109 Or App 417, 430, 820 P2d 20, 29 (1991). Such an objective method may be incorporation of standard provisions, or reference to prevailing market rates or particular methods of calculation. *Dalton*, 109 Or App at 140, 146

P3d at 411 (citations omitted).  "Additionally, in certain compelling circumstances, courts may use 'courageous common sense' in imply fair and reasonable terms that give effect to the parties' intentions."  *Id* at 140, 146 P3d at 411 (citations omitted).

In support of its motion, the Stark Group relies heavily on *Dalton* which specifically enforced a settlement agreement dividing a family corporation.  In *Dalton,* the family members signed an "agreement in principle" at a settlement conference to split the corporation into four separate corporations, each controlled by one child, to split the property among the four corporations in roughly equal parts, and to require each corporation to pay the mother's living and health expenses, among other terms.  To effectuate the agreement, the parties orally agreed for their attorneys to hire appraisers and experts and to draft the necessary documents.  However, the mother later refused to proceed with the settlement, contending that no binding agreement was formed and that many of its terms were too indefinite for specific performance.  The court disagreed.  It concluded not only that the parties entered into a binding agreement, but also that "their agreement was not lacking in material terms or methods or so indefinite so as to be unenforceable through specific enforcement."  *Id* at 150, 146 P3d at 416.

With respect to the timber deed details, the court concluded that they were considered by the parties "to be minor and incidental in comparison to the overall agreement."  *Id* at 143, 146 P3d at 412.  As to the terms of the equalization of the value of each child's corporation, the court concluded as follows:

> Here, the parties agree to work together to "finalize" the settlement agreement by equalizing the values of the four new corporations through the use of appraisers, timber deeds, and other commonly used devices such as lot line adjustments and cash payments.  In so doing, they anticipated acting reasonably and in good faith *through an objective method* to arrive at a result where the major agreed-upon divisions were potentially balanced with relatively minor details, such as the location of

> lot lines, the number of trees that could and should be cut at any location,
> or the use of cash payments.

*Id* at 143-44, 146 P3d at 412-13 (citations omitted) (emphasis added).

The court similarly concluded that the details of the redemption agreement, by which the four corporations would purchase the shares held in them by the mother's trust on her death, were either "immaterial or sufficiently definite to allow specific performance." *Id* at 144, 146 P3d at 413. As to the redemption price, the parties agreed to the objective method of hiring "jointly selected appraisers to accurately determine the fair market value of the shares given the discount." *Id* at 145, 146 P3d at 413. The court also rejected the mother's argument that the agreement was "unenforceable because the details of the divisive reorganization, including the means by which tax liability would be minimized, were unsettled." *Id* at 150, 146 P3d at 416. It found "that the parties intended to leave those matters to [the attorneys] and others expert in the fields of tax and business law." *Id* at 150, 146 P3d at 416.

In stark contrast with *Dalton*, the security and tax issues at issue here were not minor or incidental terms, and the parties merely agreed to continue to negotiate those issues without specifying any objective method for resolution. Emails mentioned needing a "business guy . . . not a litigator," but as of August 1, the parties had not discussed referring the tax or security questions to other professionals. Hutchinson Decl., Ex. 5. In fact, on August 2, Mr. Dolinajec drafted a plan for addressing the tax liability without consulting a tax professional.

The August 1 Terms also failed to define how the tax issue could be resolved or how security would be deemed sufficiently adequate. Mr. Dolinajec first mentioned the value of the tax burden ($240,000) in his August 1 email, but the parties never agreed that this value would guide future negotiations of the tax issue. Mr. Whittemore's August 19 email suggested that the Stark Group had not decided whether they interpreted "resolvable" as a reduction or absolution

15 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

of the Chans' tax liability.  *Id*, Ex. 13.  In fact, the Stark Group's offer on August 27 covered

only 50% of the Chans' tax liability until Mr. Madden authorized his counsel to offer full

coverage on August 28.  *Id*, Exs. 18, 20.  Likewise, negotiations did not consider a 90%

encumbrance-to-value ratio as an objective way to measure the adequacy of proposed real estate

until August 21.  *Id*, Ex. 21.  Thus, without objective metrics, the security and tax issues were not

sufficiently definite for the court to specifically enforce the August 1 Terms.

      **D.**     **Enforceability of a Preliminary Contract**

     "Oregon courts, while acknowledging the dictates of courageous common sense in

permitting specific performance, have nevertheless been reluctant to engage in substantive 'gap-

filling.'"  *Miller v. Ogden*, 134 Or App 589, 593, 896 P2d 596, 598-99 (1995).  However,

Oregon courts recognize some "compelling circumstances" in which a preliminary agreement

may be enforceable despite a lack of definite, material terms.  *Dalton*, 209 Or App at 140, 146

P3d at 410.  The Stark Group argues that two of these circumstances are applicable here:

> [T]o the extent that the parties have not made their intent completely clear,
> the court may be able to carry their intent into effect by filling in any gaps
> in their initial agreement through the use of courageous common sense
> and reasonable implications of fact. . . .  Finally, in some circumstances,
> when the parties have bargained to an understanding but have not agreed
> with respect to an essential term, the court may imply a reasonable term.

*Hughes*, 189 Or App at 265-66, 76 P3d at 116 (citations and internal quotations marks omitted).

     In *Hughes*, the defendants argued that their preliminary agreement was unenforceable

without formal and complete written documentation.  The agreement included a decision to split

equally the cost of paving a roadway and to create a homeowner's association.  Instead, the court

found the parties intended the disputed agreement to be binding immediately and for subsequent

documentation to simply implement the essential terms to which they had agreed.  The

16 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

documents missing were a formal settlement agreement, a new road maintenance agreement, and the creation of a homeowner's association.

*Hughes* is distinguishable for two reasons.  First, the parties in *Hughes* recognized that the implementation documents were "minor in nature and did not affect the essential terms of the agreement."  *Id* at 267, 76 P3d at 116.  As explained above, the security and tax issues included in the August 1 Terms were material and essential to the final settlement.  Second, the agreement in *Hughes* completely resolved the question of *how* to deal with the unpaved road:  the parties would pave the road, each paying a third of the cost, and would create a homeowner's association to oversee future maintenance.  In contrast, as of August 1, the parties here were unclear how they would address the Chans' need to secure the payment and resolve their tax burden.  They were still considering a variety of solutions for security (a Confession of Judgment or real property) and tax deferment (increased payment or formation of a limited liability company).  Any of those choices would require different documentation to implement.  *Hughes* involved quite a different situation.

*Hughes* cites two other cases for support, neither of which assists the Stark Group. *Hughes*, 189 Or App at 266, 76 P3d at 116.  First, *Hughes* cites *Harrisburg Ed. Assn. v. Harrisburg Sch. Dist. #7*, 186 Or App 335, 63 P3d 1176 (2003), as authority to imply reasonable terms when the parties have bargained to an understanding but have not agreed on essential terms.  However, the *Harrisburg* scenario arises when the parties to a contract "fail to foresee the situation which later arises and gives rise to a dispute."  *Harrisburg*, 186 Or App at 345, 63 P3d at 1182 (citation omitted).  The dispute implicates the parties' intention in entering the contract even though the "written agreement lacks terms appropriate to the factual circumstance

17 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

presented." *Id* at 345, 63 P3d at 1182 (citation omitted).  That circumstance clearly does not describe the situation here.

Second, in support of its authority to fill gaps when the parties have not made their intent completely clear, *Hughes* cites *Van v. Fox*, 278 Or 439, 564 P2d 695 (1977).  The parties in *Van* testified that they shared a common understanding as to the essential terms of the agreement, but failed to clearly document that joint intent.  Based on this evidence of common intent and agreement on all essential terms, the court found the parties' letter of intent sufficiently definite for enforcement, despite its ambiguous articulation of the parties' intent.

In contrast to *Van*, here the parties never shared a common understanding of all the essential terms.  The Stark Group's August 28 offer to pay an additional $240,000 is a reasonable way to carry out the parties' intent to mitigate the Chans' tax burden.  However, the parties never agreed on how to adequately secure the settlement payment.  As of August 28, they were still negotiating over different combinations of various commercial rental properties and a Confession of Judgment.  The *Van* standard is essentially one of "substantial fairness to both parties."  *Van*, 278 Or at 446, 564 P2d at 699.  While it seems imprudent for the Chans to have rejected the August 28 offer, it would betray the Chans' intent if the court forced them to accept security that, for whatever reason, they had already rejected as inadequate.

Citing the authority in *Hughes*, the Stark Group contends it would be reasonable for the court to give effect to the parties' intent by filling in the August 1 Terms with those proposed on August 28, namely to pay the Chans' tax liability in full ($240,000) and to provide two properties (the Martin Apartments and the King Apartments) as security.  As the Stark Group's argument goes, the August 1 Terms was an "agreement with open terms," and by filling in those

18 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

terms, the court would fulfill the settlement objective of dismissing all claims in exchange for $1.05 million paid over 18 months.

However, the Stark Group mischaracterizes the parties' intent. "Whether the parties have made an agreement, either preliminary or ultimate, with open terms depends on whether they intend to be bound *even if they are unable to agree on the open terms*." *Dalton*, 209 Or App at 141 n18, 146 P3d at 411, quoting FARNSWORTH ON CONTRACTS § 3.8c. As explained above, the Chans did not intend to accept payment of $1.05 million without resolution of the "open terms," and, in particular, receipt of what they considered to be adequate security.

Resolution of that "open term" has yet to occur because subsequent negotiations between August 2 and August 28 failed to produce agreement on the tax and security issues. Instead, the communications represented a series of offers and counteroffers that never reached final resolution. The Chans did not accept the Stark Group's final offer regarding security made on August 28. If the court filled in the term of adequate security as proposed by the Stark Group on August 28, then it would achieve only one party's intent for the outcome of the parties' settlement negotiations. In other words, even if the August 1 Terms was an "agreement with open terms," as the Stark Group contends, filling in those terms would not give effect to any common intent of the parties.

To support the contention that their August 28 security offer was a reasonable settlement term according market standards, the Stark Group offered the testimony[5] of their expert, Mr. Holmes, that the Martin and King Apartments would adequately secure the entire settlement

---

[5] Mr. Holmes presented a schedule of three scenarios analyzing the adequacy of the Martin and King Apartments as security. All scenarios assume a settlement amount of $1,190,000, including the $240,000 tax liability. The first scenario assumes all current market conditions (in July 2013) and results in $1,060,000 of excess settlement coverage. The second scenario, assuming a 20% drop in fair market value during the first 12 months of the payment period, results in $30,0000 of excess settlement coverage. The third scenario, assuming an 80% loan-to-value ratio, would allow the Stark Group to borrow $1,220,000 against the equity in the properties. Mr. Holmes testified that, according to a commercial lender, an 80% loan-to-value ratio was appropriate in this type of arrangement.

payment.  However, whether the Chans rejected offers considered reasonable by industry standards has no bearing on the enforceability of the August 1 Terms.  Parties are entitled to act arbitrarily and unreasonably in negotiating and reaching a settlement agreement.

Alternatively, the Stark Group argues if the court finds the August 1 Terms encompassed all essential terms, it should enforce the settlement because the Chans failed to bargain in good faith on the remaining terms.  The requirement that future negotiations be conducted in good faith by both parties applies only to terms remaining after the parties agree on all essential terms. *Hughes*, 189 Or App at 266, 76 P2d at 116.  Because the court finds the August 1 Terms failed to include agreement on the essential tax and security terms, any alleged bad faith by the Chans is not a ground for specific performance.

Furthermore, the conduct tagged as "bad faith" by the Stark Group appears to be only a misunderstanding.  The Stark Group complains that Mr. Dolinajec acted in bad faith when he refused to "discuss settlement with you unless you abandon this fiction" that the parties had reached a deal.  Hutchinson Decl., Ex. 15.  Mr. Dolinajec made that statement in response to Mr. Whittemore's insistence that the parties had agreed to a payment amount and to continue their negotiations over acceptable security and a tax solution.  *Id*, Ex. 13.  In his cantankerous reaction, Mr. Dolinajec seems to have misinterpreted Mr. Whittemore's email to mean the parties had a deal even without resolving the remaining issues.  Viewing Mr. Whittemore's email as mischaracterizing the parties' prior dealing, Mr. Dolinajec responded appropriately and not in bad faith.  Besides, Mr. Dolinajec did continue to discuss settlement after that date.

///

///

///

20 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

### E.        **Conditions Precedent**

The Stark Group also seeks specific enforcement under the alternative theory that the tax and security terms were conditions precedent which the Stark Group subsequently fulfilled by offering to pay the Chans' entire tax liability and to include two rental properties as security. "Whether a provision in a contract is a condition, the nonfulfillment of which excuses performance, depends upon the intent of the parties, to be ascertained from a fair and reasonable construction of the language used in light of all the surrounding circumstances."[6] *Dan Bunn, Inc. v. Brown*, 285 Or 131, 143, 590 P2d 209, 215 (1979).  The Chans responded to the proposal with language characteristic of conditional acceptance:  "*provided the* tax issue is resolvable and there is adequate security."  Hutchinson Decl., Ex. 5 (emphasis added).

However, Mr. Dolinajec's statements and behavior throughout the negotiations best support his use of the word "provided" to communicate the Chans' unwillingness to be bound to a settlement without reaching agreement on the unresolved material terms.  Therefore, whether the phrasing is construed as a condition precedent, the fact that the parties failed to reach an agreement on the tax and security issues prevents specific performance of the contract.  Moreover, the requirements of resolving the tax issue and providing adequate security are too ambiguous to constitute conditions precedent.  When an agreement contains definite and unambiguous promises, there must be equally clear and unambiguous language before a court will find a condition precedent.  *O'Connor v. Zeldin*, 118 Or App 620, 623, 848 P2d 647, 648 (1993).  For these reasons, the court rejects the Stark Group's alternative contract theory.

///

///

---

[6] The parties also dispute whether the fulfillment of a condition precedent is a requirement for contract formation or performance. However, Oregon law is clear that "a condition precedent is not a condition on which the validity of an *acceptance* is contingent; it is a condition on which *performance* is contingent."  *D'Angelo v. Schultz*, 110 Or App 445, 450, 823 P2d 997, 1000 (1992).

21 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

## <u>ORDER</u>

The Stark Group's Motion to Enforce Settlement Agreement with Third-Party Plaintiffs

Sing and Debbie Chan (docket # 109) is DENIED.

DATED October 28, 2013.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge

22 – FINDINGS OF FACT AND CONCLUSIONS OF LAW